JERRY L. NELSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nelson v. Commissioner
Docket Nos. 7524-71, 520-72.
United States Tax Court
T.C. Memo 1976-243; 1976 Tax Ct. Memo LEXIS 159; 35 T.C.M. (CCH) 1054; T.C.M. (RIA) 760243; August 9, 1976, Filed Jerry L. Nelson, pro se. [1]
*160 Richard D. Hall, Jr., and Frederick T. Carney, for respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: These cases were assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: These cases were part of a group of 37 which were consolidated for trial. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the male petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the male petitioners) and such employers. Respondent determined deficiencies in petitioner's Federal income taxes for the years 1969 and 1970 in the respective *161 amounts of $56.85 and $632.53. The only issue for decision is whether all or any portion of the per diem payments received by petitioner from Dynalectron in each of the taxable years is includible in his gross income for such years under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct amounts equal to all or any portion of the includible per diem payments, as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT Petitioner filed his 1969 and 1970 Federal income tax returns with the Internal Revenue Service Center at Chamblee, Georgia. The record does not establish what was petitioner's residence at the time he filed the petitions herein. Petitioner was employed by Dynalectron as an aircraft electrician on a field team during each of the taxable years. That corporation, as well as Lockheed, had a contract with the United States Air Force in each of such years to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or *162 support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative *163 Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)--$11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility *164 to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output *165 schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee *166 after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site *167 from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" *168 address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during *169 vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner, who and previously been employed by Lockheed in early 1969 and thereafter by the Naval Air Station at Jacksonville, Florida, was hired by Dynalectron and assigned to Key Field at Meridian, Mississippi, on November 11, 1969. Petitioner's prior employment with Lockheed had involved an assignment in Vietnam; and he made known to Dynalectron his desire to be assigned by that company to Vietnam. He was advised that if he would go to Meridian for a trial period that he would then be considered for an assignment to Vietnam. Dynalectron's representatives also told petitioner that he should not establish any sort of permanent home in Meridian, inasmuch as he would be subject to being moved to another location by Dynalectron. Petitioner remained at Meridian with Dynalectron for the remaining month and a half in 1969, for the entire year of 1970, and apparently until his employment with Dynalectron was terminated on September 2, 1971. At the time petitioner *170 was hired by Dynalectron, he advised that company that his "actual residence * * * fixed or permanent domicile" was Route 1, Box 428, Orange Park, Florida. That is the address of a seafood restaurant and trailer park which was operated by his mother. Petitioner had moved to Orange Park with his parents when he was six years old and had lived in that community until he entered the Armed Forces in the 1960's.Upon his discharge, he returned to Orange Park to work and live with his parents. Petitioner owns no real property in Orange Park. He had a savings account in a savings and loan association in that community, and was endeavoring to purchase land there. He is registered to vote in Florida and is registered with the Selective Service Board of Clay County, Florida, in which Orange Park is located. His mother forwards to petitioner any mail that she thinks is important which is addressed to him in Orange Park. Petitioner is single and has never been married. It appears that he lived in rented quarters in Meridian while assigned to Key Field. On his 1969 and 1970 Federal income tax returns, petitioner gave as his address a post office box in Meridian. Petitioner received *171 $261 and $3,168 of per diem payments from Dynalectron in 1969 and 1970, respectively, none of which did he include in income on his returns for those years. In his statutory notices of deficiency respondent determined that $261 and $3,150 were includible in petitioner's gross income under section 61, for 1969 and 1970, respectively. Respondent has not sought an increased deficiency for 1970. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969 and 1970 are includible in his gross income for those years. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and thus they were gains. The Code contains *172 no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's gross income the per diem payments he received from Dynalectron during the taxable years. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) amounts equal to all or any part of the includible per diem for each year, as expenses of travel while away from home in pursuit of his trade or business as an employee of Dynalectron, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred *173 in pursuit of business. In the present case, the parties are apart on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only *174 a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points emerge: Was petitioner's assignment to Meridian temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses? On the first point, bearing in mind the contractual arrangements between Dynalectron and the Air Force and petitioner's employment arrangements with Dynalectron -- all as described in the findings of fact -- and viewing matters from the perspective of December 31, 1969 (when petitioner had been at Meridian only six weeks) and December 31, 1970, (when he had been there only slightly more than one year), it is believed that the Meridian assignment should be regarded as temporary, at least through December 31, 1970. On the second point, the evidence impels the conclusion that petitioner did not maintain two places of abode and thereby incur those additional and duplicate living expenses the mitigation of which the deduction afforded by section 162(a)(2) is designed to accomplish. All of petitioner's living expenses were incurred at Meridian while he was assigned there, and not in Orange Park or anywhere *175 else. He thus had only one set of those living expenses which everyone must bear, and they must be regarded as among those personal, living, and family expenses which are barred deduction by section 262. Petitioner ate, worked, and slept -- in short made his home -- at Meridian and not in Orange Park; and Meridian, the place of his principal employment, must be regarded as his tax home. The result is that petitioner was at, not away from, home for the purposes of section 162(a)(2), and he should not be entitled to a deduction under that section for either 1969 or 1970. * * * * *
In accordance with the foregoing, Decisions will be entered for the respondent. Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioner at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.